No. 25-40766

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

STATE OF TEXAS; TEXAS HEALTH AND
HUMAN SERVICES COMMISSION,

Plaintiffs-Appellees,

v.

MEHMET OZ, *Administrator of the Centers for Medicare and Medicaid Services*; CENTERS
FOR MEDICARE AND MEDICAID SERVICES; ROBERT F. KENNEDY, JR.,
*Secretary, U.S. Department of Health and Human Services*; UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES;
UNITED STATES OF AMERICA,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Eastern District of Texas

---

## BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
  *Assistant Attorney General*

JAY R. COMBS
  *United States Attorney*

BRAD HINSHELWOOD
McKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7231*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8100*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument in this case. The district court vacated guidance documents and portions of a final rule, and issued a permanent injunction against the Department of Health and Human Services and the Centers for Medicare & Medicaid Services, based upon the court's conclusion that the interpretation of the Medicaid statute reflected in those agency actions is contrary to law and failed to explain a change in agency position. The district court's conclusion conflicts with a decision of the Eleventh Circuit, and defendants believe that oral argument will be of substantial benefit to this Court in understanding the important issues in this case.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION ....................................................................3

STATEMENT OF THE ISSUES..........................................................................4

STATEMENT OF THE CASE ..............................................................................4

    A.     Statutory Background................................................................4

    B.     Regulatory Background...............................................................9

          1.     Previous Regulations and Proposed Regulations............................9

          2.     Informational Bulletins .......................................................11

          3.     2024 Final Rule..................................................................14

    C.     Prior Proceedings....................................................................15

SUMMARY OF ARGUMENT........................................................................... 17

STANDARD OF REVIEW ............................................................................... 20

ARGUMENT ................................................................................................... 20

I.     The Challenged CMS Regulation and Guidance Documents Are Consistent with the Medicaid Statute, the Major-Questions Doctrine, and the APA. ................................................................................................ 20

    A.     The Hold-Harmless Provision in Subsection (4)(C)(i) Prohibits States from Raising Medicaid Revenue Under a Private-Redistribution Arrangement...........................................................20

          1.     A "hold harmless provision" is "in effect" under Subsection (4)(C)(i) in the circumstances described in the 2023 Bulletin and 2024 Final Rule................................................21

2.      The district court's interpretation of Subsection (4)(C)(i) is inconsistent with the statute's plain language and its purpose in the Medicaid program.......................................................26

B.      The Major-Questions Doctrine Does Not Justify Ignoring the Statute's Plain Text. ...................................................................................30

C.      The 2024 Final Rule Does Not Reflect an Unexplained Change in Official Agency Position. .............................................................................34

II.    At a Minimum, the District Court Erred in Granting Universal Vacatur. ........ 46

CONCLUSION ........................................................................................................... 49

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.,*
  594 U.S. 758 (2021) ............................................................................ 34

*Arkansas Dep't of Health & Hum. Servs. v. Ahlborn,*
  547 U.S. 268 (2006) ........................................................................... 4, 5

*Becerra v. Empire Health Found. ex rel. Valley Hosp. Med. Ctr.,*
  597 U.S. 424 (2022) ............................................................................ 21

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ....................................................................... 31, 33

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ............................................................................ 32

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ......................................................... 46, 47
  602 U.S. 406 (2024) ............................................................................ 47

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
  45 F.4th 846 (5th Cir. 2022) .............................................................. 46

*Delta Found., Inc. v. United States,*
  303 F.3d 551 (5th Cir. 2002) .............................................................. 41

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................ 34

*Florida Agency for Health Care Admin. v. Administrator for CMS,*
  161 F.4th 765 (11th Cir. 2025) ........................................ 3, 18, 25, 27, 28, 38,
                                                                           40, 41, 42, 43

*Food & Drug Admin. v. Wages & White Lion Invs., LLC,*
  604 U.S. 542 (2025) ................................................................... 44, 45, 46

*Groff v. DeJoy,*
  600 U.S. 447 (2023) ............................................................................ 20

*Gustafson v. Alloyd Co.,*
  513 U.S. 561 (1995) ............................................................................ 21

*In re Hawaii Dep't of Hum. Servs. Bd.*,
   DAB No. 1981, 2005 WL 1540188 (2005) ....................................................... 36, 40, 41

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ...................................................................................... 40, 44

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024) ............................................................................................ 32

*Luna Perez v. Sturgis Pub. Schs.*,
   598 U.S. 142 (2023) ............................................................................................ 21

*Mayfield v. U.S. Dep't of Lab.*,
   117 F.4th 611 (5th Cir. 2024) .................................................................. 31, 33, 34

*National Ass'n of Mfrs. v. Department of Def.*,
   583 U.S. 109 (2018) ............................................................................................ 20

*OnPath Fed. Credit Union v. U.S. Dep't of Treasury*,
   73 F.4th 291 (5th Cir. 2023) ............................................................................... 20

*Schweiker v. Gray Panthers*,
   453 U.S. 34 (1981) .............................................................................................. 21

*S.D. ex rel. Dickson v. Hood*,
   391 F.3d 581(5th Cir. 2004) ................................................................................. 4

*Smiley v. Citibank (S.D.), N.A.*,
   517 U.S. 735 (1996) ............................................................................................ 44

*Texas Med. Ass'n v. U.S. HHS*,
   110 F.4th 762 (5th Cir. 2024) ............................................................................. 48

*Texas Med. Ass'n v. U.S. HHS*,
   120 F.4th 494 (5th Cir. 2024) ............................................................................. 47
   138 F.4th 961 (5th Cir. 2025) ............................................................................. 47

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ............................................................................................ 48

*United States v. Texas*,
   599 U.S. 670 (2023) ............................................................................................ 46

*UnitedHealthcare of N.Y., Inc. v. Lacewell*,
   967 F.3d 82 (2d Cir. 2020) ................................................................................. 43

*University of Med. & Dentistry of N.J. v. Corrigan,*
  347 F.3d 57 (3d Cir. 2003) ............................................................... 42

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ......................................................... 18, 31, 33

*Wyoming Outdoor Council v. U.S. Forest Serv.,*
  165 F.3d 43 (D.C. Cir. 1999) ............................................................ 38


**Statutes:**

Medicaid Voluntary Contribution and Provider-Specific
  Tax Amendments of 1991,
  Pub. L. No. 102-234, 105 Stat. 1793 ................................................ 6
    Sec. 2(a), § 1396b(w)(1)(B), 105 Stat. at 1793-94 ........................ 8
    Sec. 2(a), § 1396b(w)(4), 105 Stat. at 1797 ................................ 6
      42 U.S.C. §§ 1396-1396v ......................................................... 4
      42 U.S.C. § 1396a ................................................................... 5
      42 U.S.C. § 1396b(a) ............................................................ 26
      42 U.S.C. § 1396b(w) ......................................................... 1, 5
      42 U.S.C. § 1396b(w)(1)(A) .................................................... 5
      42 U.S.C. § 1396b(w)(1)(A)(iii) ......................................... 8, 31
      42 U.S.C. § 1396b(w)(4) ....................... 6, 17, 21, 22, 24, 25
      42 U.S.C. § 1396b(w)(4)(A) ............................................ 22, 23
      42 U.S.C. § 1396b(w)(4)(B) .................................................. 22
      42 U.S.C. § 1396b(w)(4)(C)(i) ........... 2, 9, 17, 22, 23, 24, 29, 30
      42 U.S.C. § 1396b(w)(4)(C)(ii) ............................................. 29
      42 U.S.C. § 1396d(b) ............................................................. 5
      42 U.S.C. § 1396d(b)(1) ......................................................... 5

5 U.S.C. § 706(2)(A) ....................................................................... 20

28 U.S.C. § 1291 ............................................................................... 4

28 U.S.C. § 1331 ............................................................................... 3


**Regulations:**

42 C.F.R. § 430.3(e) ........................................................................ 16

42 C.F.R. § 433.68(f) ................................................................... 9, 15

42 C.F.R. § 433.68(f)(3) ............................................. 12, 14, 29, 35

42 C.F.R. § 433.74(a) ................................................................................ 6, 7

42 C.F.R. § 438.6(c)(2)(ii)(G) ..................................................................... 14

42 C.F.R. § 438.6(c)(2)(ii)(G)-(H) .............................................................. 16

42 C.F.R. § 438.6(c)(2)(ii)(H)(1) ................................................................ 14

42 C.F.R. § 438.6(c)(8)(vii) ........................................................................ 14


**Legislative Material:**

137 Cong. Rec. 32,871 (1991) .................................................................... 7, 8


**Other Authorities:**

*Implement*, Merriam-Webster.com,
    https://perma.cc/9DU2-KW3F ................................................................ 39

*Provision*, Black's Law Dictionary (12th ed. 2024) ...................................... 22

CMS, HHS, *CMCS Informational Bulletin: Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments* (Feb. 17, 2023),
    https://perma.cc/CTG5-YPQP ................................................................ 11

CMS, HHS, *CMCS Informational Bulletin: Exercise of Enforcement Discretion until Calendar Year 2028 for Existing Health Care-Related Tax Programs with Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments* (Apr. 22, 2024),
    https://perma.cc/W7XU-GQQ6 ............................................................... 13

OIG, HHS, *About OIG* (Jan. 2026),
    https://perma.cc/5RRX-FH9Q ................................................................ 42

U.S. HHS, *About DAB: Organizational Overview*,
    https://perma.cc/7FEF-EXWG ............................................................... 41

1992 Interim Final Rule,
    57 Fed. Reg. 55,118 (Nov. 24, 1992) ................................................ 8, 9, 36

2007 Proposed Rule,
    72 Fed. Reg. 13,726 (Mar. 23, 2007) ...................................................... 8, 9

2008 Final Rule,
    73 Fed. Reg. 9685 (Feb. 22, 2008) ............................................... 6, 12, 25, 26, 28, 29, 36,
                                                                                                                 37, 38, 39, 41, 42

2019 Proposed Rule,
    84 Fed. Reg. 63,722 (Nov. 18, 2019) ...................................................... 10, 37, 38, 39, 42

2021 Proposed Rule Withdrawal,
    86 Fed. Reg. 5105 (Jan. 19, 2021) ........................................................................... 10, 11

2024 Final Rule,
    89 Fed. Reg. 41,002 (May 10, 2024) ............................................... 6, 14, 24, 26, 28, 29,
                                                                                                                 33, 35, 39, 42, 44, 45

**INTRODUCTION**

The States and federal government share responsibility for funding the Medicaid program, which provides medical care to some of the neediest Americans.  Each State raises revenue for Medicaid, and the federal government "matches" the amount the State spends on medical assistance according to a state-specific "federal medical assistance percentage," either dollar for dollar, or by providing a greater amount than the State.  In Texas, "approximately 60%" of Medicaid funding is federal, ROA.21, so the State raises about 40 cents of every dollar spent on Medicaid, and the federal government provides the remaining 60 cents.

The possibility of unlimited federal "matching" motivated States in the 1980s to find ways to raise revenue for Medicaid, and then to return the revenue to its source after the State had used the revenue to obtain federal "matching" funds.  Such arrangements, which arose in a variety of configurations, allowed a State to obtain an increased federal contribution to Medicaid without making any corresponding increased contribution itself, leaving the federal government to bear more than its statutory share of the costs of Medicaid.

Congress closed this loophole in 1991.  A statutory "limitation on [the] use of provider-specific taxes to obtain Federal financial participation under Medicaid," 42 U.S.C. § 1396b(w), excludes state tax revenue from federal matching if the tax is paid by health-care providers, and the "State or other unit of government imposing the tax provides … for any payment … that guarantees to hold taxpayers harmless for any

portion of the costs of the tax," *id.* § 1396b(w)(4)(C)(i) (Subsection (4)(C)(i)).  Congress thus prohibits federal matching when the "State or other unit of government" first imposes a tax on health-care providers, and then "provides … for [a] payment" that reimburses the providers for paying all or part of the tax.

The Centers for Medicare & Medicaid Services (CMS), which administers Medicaid for the federal government, discovered a new type of arrangement where (1) a group of health-care providers ask a local government to tax them to support Medicaid; (2) the State uses the resulting revenue to obtain federal matching Medicaid funds; (3) the State uses the combined state and federal funds to make increased payments to Medicaid providers; and (4) the providers redistribute these payments to ensure that all taxpaying providers are compensated for the tax they paid.  The result is a net increase in Medicaid funding, at no real cost to either the State or its providers, but at significant cost to the federal government.

After thoroughly evaluating this novel scheme, in 2023 CMS issued an informational bulletin (2023 Bulletin) reminding States that using state funds to reimburse health-care providers' taxes violates Subsection (4)(C)(i) regardless of the mechanism of reimbursement, and that Subsection (4)(C)(i) prohibits the private-redistribution scheme.  In 2024, CMS issued another informational bulletin (2024 Bulletin) explaining that it would exercise its enforcement discretion and give States until 2028 to come into compliance with federal requirements with respect to preexisting private-redistribution schemes.  And CMS promulgated a rule (2024 Final

2

Rule) containing new regulatory provisions that require States to ensure that providers receiving state-directed payments under Medicaid attest that they are not participating in any impermissible hold-harmless arrangements.

The district court held that private agreements among health-care providers to redistribute Medicaid payments to reimburse their provider-tax costs do not violate Subsection (4)(C)(i), even if a State knows about or encourages such agreements. The court also invoked the major-questions doctrine in rejecting CMS's interpretation of Subsection (4)(C)(i). And the court held that the 2024 Final Rule is arbitrary and capricious for failing to explain a change in agency position.

The district court erred in all three respects. As the Eleventh Circuit recently explained in rejecting materially identical statutory and arbitrary-and-capricious arguments, the district court's "reading [of the statutory text] has no footing in the ordinary rules of syntax," and "CMS didn't change its position … regarding the meaning of [Subsection (4)](C)(i)." *Florida Agency for Health Care Admin. v. Administrator for CMS*, 161 F.4th 765, 782, 786 (11th Cir. 2025). Nor does the major-questions doctrine provide a basis to disregard the clear meaning of the statutory text.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.19; ROA.636. The district court granted plaintiffs' motion for summary judgment in part and entered final judgment on September 24, 2025. ROA.2001-2002. The

government timely appealed on November 21, 2025.  ROA.2003.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The questions presented are:

1.      Whether CMS's interpretation of Subsection (4)(C)(i), whereby private-redistribution schemes are encompassed within the statutory definition of impermissible hold-harmless arrangements, is consistent with the Medicaid statute, the major-questions doctrine, and the Administrative Procedure Act (APA).

2.      Whether the district court erred in ordering universal vacatur of the challenged regulatory provisions and informational bulletins.

## STATEMENT OF THE CASE

### A.      Statutory Background

"Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states" that elect to participate and "furnish medical assistance to eligible low-income individuals."  *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585 (5th Cir. 2004).  *See generally* 42 U.S.C. §§ 1396-1396v (codifying Title XIX of the Social Security Act).  States design and administer their own Medicaid programs under a state plan, a task performed in Texas by the Texas Health and Human Services Commission.  ROA.20.  On the federal side, Medicaid "is entrusted to the Secretary of Health and Human Services (HHS), who in turn exercises his authority through" CMS. *Arkansas Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006).

The federal government provides federal funds for "costs the State incurs for patient care, and, in return, the State pays its portion of the costs and complies with certain statutory requirements." *Ahlborn*, 547 U.S. at 275 (footnote omitted) (citing 42 U.S.C. § 1396a). The amount that the federal government pays is based on the "[f]ederal medical assistance percentage," and is known as the "federal share," which is calculated under a variable "matching" formula. *See* 42 U.S.C. § 1396d(b). The federal government always contributes at least half of a State's Medicaid costs, but often significantly more. *See id.* § 1396d(b)(1). The federal government pays "approximately 60%" of Texas's Medicaid costs. ROA.21. Because the federal payment is a percentage of state Medicaid expenditures, the more the State spends, the greater the federal payment. Congress has not capped the amount of federal Medicaid assistance a State can receive.

A provision of the Medicaid statute, 42 U.S.C. § 1396b(w), addresses situations in which HHS must deduct state revenues used for Medicaid before it calculates the federal financial participation. *See id.* § 1396b(w)(1)(A) ("for purposes of determining the amount to be paid to a State" by the federal government, "the total amount expended" as "medical assistance under the State plan … shall be reduced by the sum of any revenues" described in Section 1396b(w)).

Section 1396b(w) generally applies where providers that have contributed revenue to a state or local government get their money back once the State has used the funds as a basis for federal "matching." The revenue may be raised through donations,

5

or, as here, through taxes. Providers paying a health-care-related tax, for example, might agree to "support (or not oppose) a tax on their activities or revenues," and the tax revenue "would generate funds that could then be used to raise Medicaid payment rates to the providers." 2024 Final Rule, 89 Fed. Reg. 41,002, 41,073 (May 10, 2024). Such tax programs are "designed to hold Medicaid providers 'harmless' for the cost of" the tax payment—the tax will be repaid through increased Medicaid payments once the federal share of the payment is secured. *Id.* As a result, "Federal expenditures rapidly increas[e] without any corresponding increase in State expenditures, since the funds used to increase provider payments came from the providers themselves and [a]re matched with Federal funds." *Id.*; *see also* 2008 Final Rule, 73 Fed. Reg. 9685, 9687 (Feb. 22, 2008) (explaining that "hold harmless" provisions "effectively shift a disproportionate burden of the Medicaid program to the federal government").

To prevent States from obtaining federal matching funds based on revenue that is functionally only on loan to the State by providers, Congress enacted the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, Pub. L. No. 102-234, 105 Stat. 1793 (1991 Act) (codified as amended at 42 U.S.C. § 1396b(w)(4)). The statute provides that health-care-related taxes are excluded from federal "matching" if "there is in effect a hold harmless provision with respect to [the] tax." *See id.* sec. 2(a), § 1396b(w)(4), 105 Stat. at 1797.

States are required by regulation to collect the information CMS needs to ascertain that their taxes conform to the federal requirement. *See* 42 C.F.R. § 433.74(a)

6

(requiring States to give CMS "information on the source and use of all … health care-related taxes collected"). States must also "provide any additional information requested by [CMS] related to … any taxes imposed on[] health-care providers," and must "present a complete, accurate, and full disclosure of all of their … tax programs and expenditures." *Id.*

When Congress enacted the 1991 Act, many States were obtaining significant Medicaid funding through provider-specific taxes and monetary donations provided to States under arrangements that included provisions for the subsequent repayment—with public money that included federal matching funds—of the cost of the tax or gift to the taxpayer or donor. Some legislators debating the 1991 Act objected to a federal ban on these arrangements because States would have to "radically adjust programs in the middle of budget cycles," causing "drastic cuts in basic medical services" for the needy. 137 Cong. Rec. 32,871 (1991) (statement of Rep. McGrath). States' requests for federal matching Medicaid funds had ballooned, rising from $497 million in October 1990 to $3.8 billion in July 1991. *See id.* at 32,876 (statement of Rep. Solomon). A single State had raised "365 million through hospital charitable contributions to the State[,] … used that as a basis for getting a $385 million matching grant, and then in turn … refunded the charitable contributions to the various hospitals." *Id.* (statement of Rep. Lent). Doubts were raised about the federal government's capacity to continue

7

to incur these costs, when, as one legislator put it, "there is no limit on how much the Federal Treasury could be ravaged under one of these Ponzi schemes." *Id.*[1]

Since 1991, Section 1396b(w)(4) has provided that a broad-based health-care tax will be excluded from state revenues before the federal share is calculated "if there is in effect a hold harmless provision (described in paragraph (4)) with respect to the tax." 42 U.S.C. § 1396b(w)(1)(A)(iii).  Since 1992, HHS has made clear that States "may not make Medicaid or other payments to providers that result in taxpayers being repaid dollar for dollar for their tax costs."  1992 Interim Final Rule, 57 Fed. Reg. 55,118, 55,129 (Nov. 24, 1992) (interpreting Section 1396b(w)(4)).  Rather, "use of any State payment … in a way that is guaranteed to repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation" prohibited by Section 1396b(w)(4).  *Id.*

Paragraph 4 of Section 1396b(w) establishes that a "hold harmless provision"— a provision for repayment or partial repayment of a tax—exists in three situations, only one of which, Subsection (4)(C)(i), is directly at issue here.  Subsection (4)(C)(i) recognizes a category of hold-harmless arrangements that satisfies a "[g]uarantee [t]est." 2007 Proposed Rule, 72 Fed. Reg. 13,726, 13,730 (Mar. 23, 2007).  This case involves payments provided for by the State, rather than the offset or waiver also mentioned in

---

[1] In light of the States' reliance interests, Congress in the 1991 Act allowed States to temporarily continue certain tax programs that were unlawful under the new Act, while they adjusted their Medicaid programs.  *See* 1991 Act, sec. 2(a), § 1396b(w)(1)(B), 105 Stat. at 1793-94.

Subsection (4)(C)(i).   As relevant here, Subsection (4)(C)(i) deems a hold-harmless provision to exist when:

> [t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment … that guarantees to hold taxpayers harmless for any portion of the costs of the tax.

42 U.S.C. § 1396b(w)(4)(C)(i).

### B.    Regulatory Background

#### 1.    Previous Regulations and Proposed Regulations

CMS has promulgated notice-and-comment regulations implementing the statutory prohibition on hold-harmless provisions.  *See* 42 C.F.R. § 433.68(f).  Since 1992, when CMS first implemented the statute, CMS has interpreted Subsection (4)(C)(i) as providing that "use of any State payment … in a way that is guaranteed to repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation."  57 Fed. Reg. at 55,129; *see also* 72 Fed. Reg. at 13,730 ("A direct guarantee will be found when a State payment is made available to a taxpayer … in the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax.").

This case involves a type of "hold harmless" arrangement of which CMS only "[r]ecently" became "aware."  ROA.664.  It arises when a state or local provider tax program "involves the taxpaying providers redistributing Medicaid payments after receipt to ensure that all taxpaying providers receive all or a portion of their tax costs back (typically ensuring that each taxpaying provider receives at least its total tax amount

9

back)." ROA.664. Although the redistribution agreement is made among private parties, both the tax and the guaranteed repayment involve Medicaid funds: the tax raises money for the State's portion of Medicaid and the payments that are redistributed are monies from the state Medicaid payments that also include the federal share.

In 2019, after CMS learned of and considered such arrangements, it explained in a proposed rulemaking why Subsection (4)(C)(i) renders taxes subject to private-redistribution agreements ineligible for federal "matching." Subsection (4)(C)(i) prohibits such arrangements when the "net effect" is that "[t]he taxpayers have a reasonable expectation to be held harmless for all or a portion of their tax amount." 2019 Proposed Rule, 84 Fed. Reg. 63,722, 63,734 (Nov. 18, 2019). CMS explained that applying Subsection (4)(C)(i) to arrangements with private-redistribution agreements did not "reflect any change in policy or approach," but described additional "prohibited practices" and provided additional clarification "regarding how [States] may finance the non-federal share of Medicaid expenditures" consistently with federal law. *Id.* at 63,734-35.

The 2019 Proposed Rule addressed a broad array of Medicaid-related topics. CMS ultimately withdrew the proposed rule in its entirety to allow for further consideration in light of public comments and also intervening congressional action relevant to some of the topics addressed in the proposed rule (but not relevant here). 2021 Proposed Rule Withdrawal, 86 Fed. Reg. 5105, 5105 (Jan. 19, 2021). It explained

10

that the withdrawal "does not affect existing federal legal requirements or policy that were merely proposed to be codified in regulation." *Id.*

### 2. Informational Bulletins

In February 2023, CMS issued the first informational bulletin at issue in this case. *See* CMS, HHS, *CMCS Informational Bulletin: Health Care-Related Taxes and Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments* (Feb. 17, 2023), https://perma.cc/CTG5-YPQP (ROA.663-668). The Bulletin advised States that CMS had become aware of programs in which health-care providers paying taxes to support Medicaid were agreeing "to redirect or redistribute the Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back," either in the form of "each provider's retained portion of any original Medicaid payment (either directly from the state or from the state through a managed care plan)," or as a "redistribution payment received by the provider from another taxpayer or taxpayers," or both. ROA.665 (footnote omitted). In tax programs that include both Medicaid providers and providers with few or no Medicaid patients, "providers that furnish a relatively high percentage of Medicaid-covered services redistribute a portion of their Medicaid payments to providers with relatively low (or no) Medicaid service percentage" to cover the cost of the tax paid by the providers that do not themselves receive Medicaid payments. ROA.665.

CMS's 2023 Bulletin reminded the States of the longstanding statutory and regulatory requirement that "CMS reduce a state's medical assistance expenditures by

11

the amount of health care-related tax collections that include hold harmless arrangements, prior to calculating federal financial participation." ROA.667. It explained that the Medicaid regulation implementing Subsection (4)(C)(i) covers arrangements where private parties agree to redistribute Medicaid payments to guarantee payment of a provider tax. That regulation specifies that an impermissible arrangement exists when "[t]he State (or other unit of government) imposing the tax provides for any direct or indirect payment … such that the provision of that payment … directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount." 42 C.F.R. § 433.68(f)(3). The 2023 Bulletin explained that "[t]he word 'indirect' in the regulation" underscores that "the state or other unit of government imposing the tax itself need not be involved in the actual redistribution of Medicaid payments for the purpose of making taxpayers whole for the arrangement to qualify as a hold harmless" arrangement. ROA.666. Rather, a hold-harmless arrangement is present even when the redistribution agreement is private because "a State payment is made available to a taxpayer or a party related to the taxpayer with the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)." ROA.666 (quoting 73 Fed. Reg. at 9694).

The 2023 Bulletin explained that States "have an obligation to ensure that the sources of non-federal share of Medicaid expenditures comport with federal statute and regulations," and they can, and should, "make clear to their providers that these

arrangements are not permissible under federal requirements, learn the details of how health care-related taxes are collected, and take steps to curtail these practices if they exist." ROA.667.

In April 2024, CMS issued a second informational bulletin. *See* CMS, HHS, *CMCS Informational Bulletin: Exercise of Enforcement Discretion until Calendar Year 2028 for Existing Health Care-Related Tax Programs with Hold Harmless Arrangements Involving the Redistribution of Medicaid Payments* (Apr. 22, 2024), https://perma.cc/W7XU-GQQ6 (ROA.669-672). The 2024 Bulletin explained that CMS would "exercise [its] enforcement discretion" not to take immediate action against States with preexisting private-redistribution arrangements, to give States "time to evaluate and work with their provider communities and/or legislatures to modify existing non-Federal share financing arrangements to come into compliance with federal requirements." ROA.669. CMS accordingly would continue to provide federal financial participation for States that, as of April 22, 2024, had "the type of financing arrangements described in" the 2023 Bulletin that was "prohibited under" Subsection (4)(C)(i) and the Medicaid regulations. ROA.671. During this period of forbearance, CMS planned "to assist states … to identify and transition to allowable sources of non-Federal share while mitigating any program disruption to the greatest extent possible." ROA.670. CMS explained that it "expect[ed] states with existing hold harmless arrangements to undertake changes necessary so that by no later than January 1, 2028, the state [would be] compliant with all non-Federal share financing requirements." ROA.671.

13

### 3.     2024 Final Rule

In May 2024, CMS also promulgated new regulatory provisions designed to overcome objections from the States that they are unaware of private-redistribution agreements, as well as difficulties CMS itself has encountered in identifying and examining private-redistribution agreements among providers.  *See* 89 Fed. Reg. at 41,075-76 (reiterating that private-redistribution arrangements violate Subsection (4)(C)(i) and noting "challenges with identifying" and obtaining details on such arrangements).  Starting in January 2028, CMS would require Medicaid providers to attest that they do not participate in such agreements.  *See* 42 C.F.R. § 438.6(c)(8)(vii) (effective date of 42 C.F.R. § 438.6(c)(2)(ii)(H)(1)).  Specifically, the revised Medicaid regulations would require States to "[e]nsure that providers receiving payment under a State directed payment attest that they do not participate in any hold harmless arrangement for any health care-related tax as specified in § 433.68(f)(3) of this subchapter."  *Id.* § 438.6(c)(2)(ii)(H)(1); *see* 89 Fed. Reg. at 41,076-77, 41,079-83 (discussing attestation requirement).

A new regulatory provision also requires that state-directed payments "[c]omply with all Federal legal requirements for the financing of the non-Federal share, including but not limited to, 42 CFR 433, subpart B," which defines impermissible hold-harmless arrangements.  42 C.F.R. § 438.6(c)(2)(ii)(G); *see* 89 Fed. Reg. at 41,078-79.  Significantly, however, the 2024 Final Rule did not amend the underlying regulatory definition of

14

hold-harmless arrangements, which has remained the same since 2008. *See* 42 C.F.R. § 433.68(f).

### C.    Prior Proceedings

**1.**    In April 2023, the State of Texas and the state agency that administers its Medicaid program (collectively, Texas), brought this challenge to CMS's implementation of the hold-harmless provision with respect to private-redistribution agreements. As initially filed, this suit focused on the 2023 Bulletin, asserting that the Bulletin exceeded CMS's authority under the Medicaid statute, required notice-and-comment rulemaking, and was arbitrary and capricious for failing to acknowledge a change in agency position or consider reliance interests. ROA.40-45. In June 2023, the district court granted Texas a preliminary injunction, enjoining CMS from enforcing the 2023 Bulletin—and the statutory interpretation reflected therein—within the State. ROA.515-544; ROA.574-575. In granting preliminary relief, the court concluded that Texas was likely to succeed on its argument that the prohibition on hold-harmless arrangements in Subsection (4)(C)(i) of the Medicaid statute did not encompass private-redistribution schemes. ROA.536-539.

**2.**    In May 2024, Texas filed a supplemental complaint to extend the scope of this lawsuit to encompass the 2024 Final Rule. ROA.633-662. As relevant here, the supplemental complaint asserted that the 2024 Final Rule exceeded CMS's statutory authority; was arbitrary and capricious under the APA for failing to justify a change in

agency position, account for reliance interests, or respond to comments; and violates the major-questions doctrine. ROA.646-661.

**3.** In September 2025, the district court granted summary judgment to Texas. The court concluded that CMS's application of Subsection (4)(C)(i) was contrary to the Medicaid statute, holding that the statutory text required the *State* to guarantee to hold taxpayers harmless, while private-redistribution schemes involve private health-care providers orchestrating that guarantee instead of the State. ROA.1986-1990. The court also held that even if CMS's interpretation of Subsection (4)(C)(i) were "plausible," the major-questions doctrine applied, and the statute did not provide "clear congressional authorization" for CMS's interpretation. ROA.1993-1994 (quotation marks omitted). And the court additionally concluded that the 2024 Final Rule was arbitrary and capricious because CMS failed to explain a change in position. ROA.1995-1997.[2]

The district court thus granted Texas's request to universally vacate the challenged provisions of the 2024 Final Rule (42 C.F.R. § 438.6(c)(2)(ii)(G)-(H)) and the 2023 and 2024 Bulletins. ROA.1999. The government had argued that the court should limit the scope of any relief to Texas, but the court declined to grant party-specific vacatur on the basis that nationwide vacatur is the "default rule" in this Circuit,

---

[2] The district court separately determined that an administrative-relief provision in the 2024 Final Rule was unlawful. *See* ROA.1990-1992 (discussing 42 C.F.R. § 430.3(e)). That holding is not at issue in this appeal.

16

and it saw "no reason to depart from [that] ordinary course." ROA.1998-1999. The 2024 Final Rule and 2023 and 2024 Bulletins were thus vacated on a nationwide basis. The court also permanently enjoined CMS from enforcing the statutory interpretation reflected in those documents against Texas. ROA.1999-2000; *see* ROA.574-575; ROA.1986.

## SUMMARY OF ARGUMENT

**I.A.** By its plain terms, Subsection (4)(C)(i) prohibits any arrangement whereby health-care providers agree to use Medicaid payments to reimburse themselves for tax payments they made to a state government to support Medicaid.

The statutory provision that includes Subsection (4)(C)(i), 42 U.S.C. § 1396b(w)(4), provides that state tax revenue must be excluded from federal matching if a "hold harmless provision" is "in effect" with respect to the tax. Subsection (4)(C)(i) allows the inference that a "hold harmless provision" is "in effect" for a tax on health-care providers when "[t]he State or other unit of government imposing the tax provides … for any payment … that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* § 1396b(w)(4)(C)(i). The two statutory elements are thus a state or local tax, and the corresponding provision of a payment from state or local public funds, which guarantees the health-care providers reimbursement of some or all of the tax.

Private-redistribution schemes describe an example of a situation that gives rise to a hold-harmless provision under Subsection (4)(C)(i). A State raises a tax to support

17

Medicaid, the State uses the revenue to obtain federal matching funds, and the State "provides … for" the Medicaid payments that the private providers then redistribute amongst themselves to reimburse for the costs of the tax. Subsection (4)(C)(i) requires no more.

According to Texas, Subsection (4)(C)(i) is not violated when health-care providers arrange among themselves to redistribute Medicaid payments to reimburse themselves for paying a provider tax, because the State itself must guarantee repayment of the tax. But the plain text of Subsection (4)(C)(i) includes no such requirement. The district court's conclusion to the contrary "has no footing in the ordinary rules of syntax," *Florida Agency for Health Care Admin. v. Administrator for CMS*, 161 F.4th 765, 782 (11th Cir. 2025), and is inconsistent with congressional objectives in excluding certain health-care taxes from eligibility for federal matching.

**B.** The major-questions doctrine does not justify ignoring the plain text of the Medicaid statute. That doctrine counsels hesitation where an agency asserts an "[e]xtraordinary gran[t] of regulatory authority" and seeks "to make a radical or fundamental change to a statutory scheme" by exercising an "unheralded power" "discover[ed] in" an "ancillary provision" of "a long-extant statute." *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (alteration and quotation marks omitted). But it does not apply where a statute expressly grants an agency the relevant statutory authority and the agency merely concludes that particular factual circumstances fall within the plain terms of the statute that it administers. CMS's interpretation of the longstanding

18

statutory prohibition on hold-harmless arrangements to encompass private-redistribution schemes is thus the kind of straightforward statutory-interpretation question that does not implicate the major-questions doctrine—a question that this Court may resolve de novo. Regardless, even if the doctrine were potentially relevant here, CMS's interpretation does not implicate any of the conditions warranting its application.

**C.** Texas's arbitrary-and-capricious challenge also fails on the merits. CMS did not fail to adequately explain a change in its interpretation of Subsection (4)(C)(i), because the agency's interpretation did not change. CMS's interpretation has been consistent since 1991 that a "hold harmless" provision arises under Subsection (4)(C)(i) if Medicaid payments to providers result in the providers being reimbursed with public funds for their provider tax costs. The 2008 and 2019 rulemakings, 2023 and 2024 Bulletins, and 2024 Final Rule all rest upon that same interpretation of the statute. CMS has never taken the official position that private-redistribution schemes do not violate Subsection (4)(C)(i). The isolated statements Texas has drawn from other HHS entities, individuals' emails, and briefing from regulated parties, fall far short of showing a change in CMS's official interpretation of the statute.

**II.** The district court independently erred in granting universal vacatur of the challenged regulatory provisions and guidance documents. Although this Court considers universal vacatur to be the default remedy under the APA, it has recognized that party-specific vacatur is appropriate in certain circumstances. Those circumstances

exist here, where the Eleventh Circuit has already rejected similar statutory and APA challenges to the agency's position and there is a reduced interest in uniformity given the state-specific operation of Medicaid.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *OnPath Fed. Credit Union v. U.S. Dep't of Treasury*, 73 F.4th 291, 296 (5th Cir. 2023). CMS's decision must be upheld unless that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## ARGUMENT

I.   **The Challenged CMS Regulation and Guidance Documents Are Consistent with the Medicaid Statute, the Major-Questions Doctrine, and the APA.**

A.   **The Hold-Harmless Provision in Subsection (4)(C)(i) Prohibits States from Raising Medicaid Revenue Under a Private-Redistribution Arrangement.**

"[S]tatutory interpretation must 'begin with,' and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (alteration omitted) (quoting *National Ass'n of Mfrs. v. Department of Def.*, 583 U.S. 109, 127 (2018)). The text of Subsection (4)(C)(i) unmistakably expresses Congress's intention to prohibit Medicaid payments from being used—directly or indirectly—to repay taxes that are used as state revenue to obtain federal matching funds. That is true even when health-care providers, rather than the State, devise and execute the specific mechanism for using the Medicaid funds to repay those taxes.

20

"The Social Security Act is among the most intricate ever drafted by Congress." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981). Medicaid's hold-harmless provisions are "technical: They call to mind Justice Frankfurter's injunction that when a statute is 'addressed to specialists, it must be read by judges with the minds of the specialists.'" *Becerra v. Empire Health Found. ex rel. Valley Hosp. Med. Ctr.*, 597 U.S. 424, 434 (2022) (alteration omitted). In construing provisions embedded in a program like Medicaid, the way "an ordinary reader would understand [a] particular provision" must be informed by "contextual clues" from the surrounding statute, *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 148 (2023), and the statute should be read as part of "a symmetrical and coherent regulatory scheme" rather than "a series of unrelated and isolated provisions," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569-70 (1995).

> **1.    A "hold harmless provision" is "in effect" under Subsection (4)(C)(i) in the circumstances described in the 2023 Bulletin and 2024 Final Rule.**

Section 1396b(w)(4) addresses situations in which federal funding will be unavailable to "match" otherwise eligible state expenditures that are financed by a state or local tax because a "hold harmless provision" is "in effect" with respect to the tax. 42 U.S.C. § 1396b(w)(4). Structurally, Section 1396b(w)(4) consists of an introductory paragraph that explains that the complete subsection defines the types of "hold harmless" provisions that disqualify tax revenue from federal financial participation. The introductory paragraph is followed by three subparagraphs (labeled (A)-(C)) that set forth the indicia of the three types of "hold harmless" arrangements in which a

21

taxpayer is deemed to recover all or part of the cost of the tax from government funds. The first sentence of the subsection provides that "there is in effect a hold harmless provision with respect to a broad-based health care related tax imposed with respect to a class of items or services if the Secretary determines that any of the following applies." *Id.*

The words "the following" are followed by subparagraphs (A), (B), and (C), which describe three situations in which a prohibited "hold harmless" provision is "in effect." The three statutory tests for a "hold harmless" provision are the presence of:

- a payment from the State in an amount "positively correlated either to the amount of such tax or to the difference between the amount of the tax and the amount of payment under the State plan," 42 U.S.C. § 1396b(w)(4)(A);

- a Medicaid payment that "varies based only upon the amount of the total tax paid," *id.* § 1396b(w)(4)(B); and

- "[t]he State or other unit of government imposing the tax provides (directly or indirectly) for any payment … that guarantees to hold taxpayers harmless for any portion of the costs of the tax," *id.* § 1396b(w)(4)(C)(i).

Reading the three subsections of Section 1396b(w)(4) in parallel, each subsection defines a type of "hold harmless provision" by setting forth factual criteria whose presence establishes that a "hold harmless provision" is "in effect."

A "hold harmless provision" that precludes federal "matching" thus need not be written, express, or even a "provision" in the sense in which that term is ordinarily understood in other legal settings (such as a contractual or statutory "provision"). *See Provision*, Black's Law Dictionary (12th ed. 2024) ("A clause in a statute, contract, or

other legal instrument."). Rather, Section 1396b(w) defines a prohibited "hold harmless provision" by inference from the facts described in the statute, such as a correlation between the amounts of certain taxes and payments, *see* 42 U.S.C. § 1396b(w)(4)(A), or the existence of state provider tax revenues and payments back from the State that serve to guarantee repayment of the tax, *see id.* § 1396b(w)(4)(C)(i).

By its plain terms, Subsection (4)(C)(i) is satisfied—and a "hold harmless provision" is "in effect"—when two elements are present. First, "[t]he State or other unit of government impos[es]" a "broad-based health care related tax" for Medicaid. 42 U.S.C. § 1396b(w)(4)(C)(i). Second, the State or other unit of government "provides … for any payment … that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* The payment may be provided for "directly or indirectly." *Id.*

Subsection (4)(C)(i) thus looks to whether a particular tax arrangement includes two Medicaid-related payments. The "State or other unit of government" must both (1) raise a health-care-related tax that the State uses for federal "matching," and (2) provide for a "payment … that guarantees to hold taxpayers harmless" for the costs of the tax. 42 U.S.C. § 1396b(w)(4)(C)(i). Fittingly for a statute that defines the relationship between the States and the federal government in this area, Congress regulated only state revenues and state payments. No other criteria must be satisfied for a hold-harmless provision to be in effect under Subsection (4)(C)(i).

The arrangements addressed in the 2023 Bulletin and 2024 Final Rule, in which health-care provider taxpayers enter "into oral or written agreements … to redirect or

redistribute … Medicaid payments to ensure that all taxpayers receive all or a portion of their tax back," ROA.665, satisfy both elements of Subsection (4)(C)(i). First, "[t]he State or other unit of government impos[es]" a "broad-based health care related tax" for Medicaid. 42 U.S.C. § 1396b(w)(4)(C)(i). Second, on the repayment side of the ledger, the "State or other unit of government … provides (directly or indirectly) for any payment … that guarantees to hold taxpayers harmless for any portion of the costs of the tax." *Id.* Under these private-redistribution schemes, "the taxpaying providers" are "redistributing Medicaid payments after receipt" to reimburse the tax costs, "typically ensuring that each taxpaying provider receives at least its total tax amount back." ROA.664; *see* 89 Fed. Reg. at 41,075. On these facts, the "State or other unit of government" has provided for the payment, and that payment guarantees that providers will be repaid their costs of the tax. Both requirements of Subsection (4)(C)(i) are satisfied and a "hold harmless provision" is "in effect." 42 U.S.C. § 1396b(w)(4).

Importantly, under Subsection (4)(C)(i), the presence of a hold-harmless provision is not contingent upon a state or local government's promise to repay the tax. Rather, the statutory text makes clear that a "hold harmless provision" is "in effect" when "[t]he State or other unit of government imposing the tax *provides* (directly or indirectly) *for any payment* … that guarantees to hold taxpayers harmless for any portion of the costs of the tax." 42 U.S.C. § 1396b(w)(4)(C)(i) (emphases added). The statute requires that the payment must come, directly or indirectly, from the state or local government, but it does not require that the payment be used in any particular manner

24

to guarantee repayment of the tax. CMS has correctly concluded that a hold-harmless provision comes into effect under Subsection (4)(C)(i) when Medicaid payments are redistributed by agreement among taxpaying health-care providers, in such a way that each provider is reimbursed by Medicaid for its cost of the tax.

The Eleventh Circuit recently reached this same conclusion in affirming the denial of a preliminary injunction in a challenge to the 2023 Bulletin. That Circuit explained that Subsection (4)(C)(i) "works in two steps": first, "[t]he state or local government provides for a payment offset or waiver," and second, "the payment, offset, or waiver in turn 'guarantees to hold taxpayers harmless' for at least part of the government-imposed healthcare tax." *Florida Agency for Health Care Admin. v. Administrator for CMS*, 161 F.4th 765, 782 (11th Cir. 2025). As the Eleventh Circuit emphasized, Subsection (4)(C)(i) "simply doesn't say that the *state* must guarantee anything," and making Subsection (4)(C)(i) dependent on an active choice by the State at issue would render Subsection (4)(C)(i) different from the other "effects-based" tests for determining whether a hold-harmless arrangement is in effect in 42 U.S.C. § 1396b(w)(4). *Id.* at 783.

Moreover, CMS's interpretation of the statute is the only reasonable one in light of the relevant statutory objectives. Section 1396b(w) exists to "ensure that State claims for federal funding are supported by non-federal expenditures." 73 Fed. Reg. at 9687-88. A private arrangement to use Medicaid payments to guarantee repayment of a provider tax serves to "effectively shift a disproportionate burden of the Medicaid

25

program to the federal government" by rendering the State's financial contribution illusory. *Id.* This is just as true for privately arranged guarantees as it would be for an express guarantee by the State, and where Medicaid funds are redistributed so as to offset tax payments—rather than to merely compensate providers that provide services to Medicaid patients—that is exactly the type of "hold harmless" arrangement that Subsection (4)(C)(i) has prohibited since it was first enacted. It would also be inconsistent with statutory restrictions that "limi[t] [federal financial participation] to expenditures for medical assistance and qualifying administrative activities." 89 Fed. Reg. at 41,075 (citing 42 U.S.C. § 1396b(a)). Medicaid payments must be "based on the delivery of Medicaid-covered services." *Id.* Private-redistribution arrangements, however, "redirect Medicaid payments away from the providers that furnish the greatest volume of Medicaid-covered services toward providers that provide fewer, or even no, Medicaid-covered services." *Id.* These arrangements thus "seek to achieve what cannot be accomplished explicitly through a CMS-approved payment methodology": "redirecting Medicaid funds to hold taxpayer providers harmless for their tax cost, with a net effect of directing Medicaid payments to providers based on criteria other than their provision of Medicaid-covered services." *Id.*

> **2. The district court's interpretation of Subsection (4)(C)(i) is inconsistent with the statute's plain language and its purpose in the Medicaid program.**

In granting summary judgment to Texas in this case, the district court read Subsection (4)(C)(i) to provide that a State itself must guarantee to hold taxpayers

harmless. ROA.1988. The court read the statute to contain a "tight grammatical link between *the government*, as the actor providing for something, and *a guarantee,* as the thing provided for." ROA.1987 (quotation marks omitted).

The district court did not articulate the nature of that "grammatical link," and as the Eleventh Circuit explained in rejecting the same argument, that "reading has no footing in the ordinary rules of syntax." *Florida*, 161 F.4th at 782. Instead, "diagramming clause (C)(i)'s single sentence" and "matching the two key verbs with their accompanying nouns" demonstrates that the verb phrase "provides … for" takes as its object the noun "payment," rather than the word "guarantee." *Id.* And "the phrase 'that guarantees to hold taxpayers harmless' is a restrictive relative clause that modifies the phrase 'payment, offset, or waiver.'" *Id.* Accordingly, under Subsection (4)(C)(i), "[i]t is the 'State or other unit of government' that does the 'providing'" and "the 'payment, offset, or waiver' that does the 'guaranteeing.'" *Id.* (alterations omitted) (explaining that these points "see[m] obvious"). In other words, it is enough for the State to provide for a payment and the payment to guarantee to hold taxpayers harmless, regardless of whether the State directed or intended that result. The Eleventh Circuit concluded that, with this grammatical "clarification in hand, it seems clear to us that CMS has the better argument." *Id.* If Congress had wanted to require that the State instead deliberately guarantee to hold taxpayers harmless, it could easily have done so.

The district court further stated that "a 'payment' cannot 'guarantee' to hold a taxpayer harmless—only a state can." ROA.1988. The court thus seems to suggest

27

that the word "guarantee" in Subsection (4)(C)(i) "imports something like an intent requirement, which a payment—an inanimate object—can't meet." *Florida*, 161 F.4th at 783. But "lifeless items can most certainly 'guarantee' things." *Id.* (listing as examples money bail and car titles). CMS has explained that a payment "guarantees" to hold a taxpayer harmless when the taxpayer has the "reasonable expectation that the payment will result in the taxpayer being held harmless." 89 Fed. Reg. at 41,075 (quoting 73 Fed. Reg. at 9694). The payment can thus "'guarantee' that a provider will be made whole after it is taxed regardless of whether the state *intends* to promise anything." *Florida*, 161 F.4th at 783. Nor did the court address how its reading of Subsection (4)(C)(i) would render that provision out of step with the surrounding paragraphs ((A), (B), and (C)(ii)), which as noted "all define effects-based tests." *Id.* (quotation marks omitted). Instead of interpreting Subsection (4)(C)(i) to be intent-based—making it the "odd one out in an otherwise effects-based list"—CMS's interpretation "dovetails" with the rest of the statute. *Id.*

The district court is similarly mistaken to the extent it suggests that a "guarantee" must be reduced to "wording" in a State's Medicaid "progra[m]" that "constitute[s] an explicit or direct assurance of … payment to the provider taxpayer." ROA.1989 (quotation marks omitted). As CMS has observed, "state laws" are "rarely overt in requiring that state payments be used to hold taxpayers harmless," and the existence of hold-harmless provisions are often inferred from the circumstances. 73 Fed. Reg. at 9694 (discussing a hold-harmless provision effectuated through a nursing-home bed tax

and correlated "grants" to nursing-home residents that could be used to pay the tax). Under the plain language of the statute, it is the state-provided "payment … that guarantees to hold taxpayers harmless," 42 U.S.C. § 1396b(w)(4)(C)(i), not the State itself; there is no statutory requirement that the State also provide an explicit repayment guarantee. CMS's 2008 Final Rule made that abundantly clear. *See* 73 Fed. Reg. at 9694 (a "direct guarantee does not need to be an explicit promise or assurance of payment," because "the element necessary to constitute a direct guarantee is the provision for payment" by the State).

The district court further erred in viewing the statute's "indirect guarantee" provision, 42 U.S.C. § 1396b(w)(4)(C)(ii), as weighing against CMS's interpretation. *See* ROA.1989. To be clear: the "indirect guarantee" provision is not at issue in this case. The scenario here involves a *direct guarantee* of repayment (by means of private agreements among providers) and an *indirect payment* by the State that provides for the funds to support the guarantee, namely, Medicaid payments to at least some of the providers that participate in a redistribution agreement. *See* 42 C.F.R. § 433.68(f)(3) (noting that there can separately be "direct or indirect payment" and "direc[t] or indirec[t] guarantees"). The fact that Subsection (4)(C)(i) can be satisfied by indirect payments "indicates that the State itself need not be involved in the actual redistribution of Medicaid funds for the purpose of returning tax amounts to taxpayers in order for the arrangement to qualify as a hold harmless" arrangement. 89 Fed. Reg. at 41,076 (citing 73 Fed. Reg. at 9694).

29

If providers agree to distribute Medicaid payments among themselves to repay their tax costs, then a "hold harmless provision" is "in effect" under Subsection (4)(C)(i) because the State has "provide[d] … for" the "payment" used to satisfy a guarantee that the tax will be repaid. 42 U.S.C. § 1396b(w)(4)(C)(i). All the statute requires is provider-furnished tax revenue that a State can use to obtain matching federal funds, and the State's provision for the payments—it does not require that the State also sponsor the direct guarantee. Congress in Section 1396b(w) acted comprehensively to protect the federal fisc from schemes to evade the requirement that States pay their fair share towards Medicaid. It did not leave a gaping loophole that would allow that intent to be subverted if the State, while not itself expressly guaranteeing the return of tax revenues, achieves functionally indistinguishable guarantees by tacitly allowing its health-care providers to redistribute Medicaid funds among themselves.

## B. The Major-Questions Doctrine Does Not Justify Ignoring the Statute's Plain Text.

The district court further erred in concluding that even if CMS's interpretation of Subsection (4)(C)(i) were "plausible," the major-questions doctrine applied and the statute did not provide "clear congressional authorization" for CMS's interpretation, such that the major-questions doctrine required reading the statute to exclude the arrangements at issue here. ROA.1993-1994 (quotation marks omitted).

The major-questions doctrine applies in certain "extraordinary cases … in which the history and the breadth of the authority that the agency has asserted, and the

30

economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (alteration and quotation marks omitted). "Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices," and Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* at 723 (alteration and quotation marks omitted). In such cases, "something more than a merely plausible textual basis for the agency action is necessary," and the agency "must point to clear congressional authorization." *Id.* (quotation marks omitted).

CMS is not purporting to exercise an "unheralded power" "discover[ed] in" an "ancillary provision" of "a long-extant statute," *West Virginia*, 597 U.S. at 724 (alteration and quotation marks omitted), or to "effect a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (alterations and quotation marks omitted). Rather, from the beginning, the statutory text has clearly required CMS to police whether impermissible hold-harmless arrangements are "in effect" when States collect provider taxes to fund their share of Medicaid. 42 U.S.C. § 1396b(w)(1)(A)(iii); *see Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024) (declining to apply doctrine where the agency "asserts an authority that it has asserted continuously since 1938," when the relevant statute was passed). Indeed, unlike the seminal major-questions doctrine cases, in which agencies have exercised grants of rulemaking or other delegated authority to

31

impose broad and novel substantive requirements, the agency here is not asserting any sort of lawmaking power at all. It has simply adopted an interpretation of the longstanding statutory prohibition on hold-harmless arrangements under which that prohibition covers the novel arrangements CMS identified in the 2023 Bulletin. Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the agency's interpretation is not entitled to deference; the question before a reviewing court is simply whether the interpretation is or is not correct. The major-questions doctrine has never been understood or applied as a canon requiring that any ambiguity in a statute be construed against an agency charged with administering a statutory scheme. Nor does it bear on this Court's review of an agency's unremarkable conclusion that a novel fact pattern falls within the plain terms of a general statutory rule. *See Bostock v. Clayton County*, 590 U.S. 644, 669 (2020) (observing that there is no "such thing as a 'canon of donut holes' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception").

Moreover, even if the doctrine were potentially relevant, none of the reasons the district court gave would justify invoking it here. The court believed that the interpretation at issue involves "a matter of great economic significance" because state-directed payments under Medicaid amounted to $78.1 billion in 2023. ROA.1993-1994. That was mistaken both factually and legally. Factually, the $78.1 billion figure accounts for *all* state-directed payments; payments made to effectuate the impermissible hold-

32

harmless arrangements at issue here would make up only a portion of that $78.1 billion.[3] And even if that $78.1 billion figure were relevant, it reflects only "9.0 percent of total Medicaid benefit expenditures ($869.7 billion)." 89 Fed. Reg. at 41,258.

Thus, by any measure, the question at issue here is far less economically significant than the "hundreds of billions of dollars of impact" at issue in the "recent cases" deemed sufficiently significant by the Supreme Court. *Mayfield*, 117 F.4th at 616; *see, e.g.*, *Nebraska*, 600 U.S. at 496 (student-loan forgiveness program "affecting 43 million Americans and $430 billion in federal debt"); *West Virginia*, 597 U.S. at 715, 724 (plan "to substantially restructure the American energy market" that was estimated to "reduce GDP by at least a trillion 2009 dollars by 2040"). Indeed, because of the size of the programs, virtually every interpretation of the Medicare and Medicaid statutes may affect the distribution of large sums; that does not convert every statutory question under those programs into a case for application of the major-questions doctrine.

The district court also concluded that CMS's interpretation "intrude[s] into an area that is the domain of state law" by implicating "'[c]ommercial agreements.'" ROA.1993-1994. The issue here pertains to the conduct of States in the operation of a cooperative state-federal program and of the hospitals and other entities that receive federal funds in the performance of their obligations under that program. It thus looks

---

[3] Similarly, "[h]ealth care-related taxes made up approximately 17 percent ($37 billion) of all States' non-Federal share in 2018." 89 Fed. Reg. at 41,073. And taxes paid in furtherance of impermissible hold-harmless arrangements would only comprise a portion of total taxes.

nothing like cases in which an agency has sought to regulate commercial relationships exclusively between third parties in the "particular domain of state law," such as the "landlord-tenant relationship." *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam).

In short, the major-questions doctrine is not a license to disregard Congress's express prohibition on hold-harmless arrangements, and as discussed above the arrangements at issue here are clearly encompassed within the statutory language. And even if the major-questions doctrine were potentially relevant, this case meets none of the criteria for application of the doctrine. *See Mayfield*, 117 F.4th at 616.

**C.    The 2024 Final Rule Does Not Reflect an Unexplained Change in Official Agency Position.**

The district court further erred in concluding that the 2024 Final Rule reflected an unexplained change in CMS's interpretation of Subsection (4)(C)(i). ROA.1994-1997. Under the APA, agencies must "display awareness" of changes in official position, and cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Because CMS never changed its official position with respect to the meaning of Subsection (4)(C)(i), however, its adoption of an attestation requirement in the 2024 Final Rule was not arbitrary and capricious.

**1.** As an initial matter, the change-in-position argument adopted by the district court is inapposite given the nature of the 2024 Final Rule. Texas argued that

34

CMS "change[d its] position regarding the definition of a 'hold harmless agreement.'" ROA.1995 (quoting ROA.939). As discussed, however, the text of the Medicaid statute itself treats private-redistribution schemes as hold-harmless arrangements. *See supra* Part I.A. Accordingly, there was no need for the 2024 Final Rule to change the regulatory definition of hold-harmless arrangements to encompass such schemes, and indeed the Rule did not change that regulatory provision. *See* 42 C.F.R. § 433.68(f)(3); 89 Fed. Reg. at 41,081.

Instead, the 2024 Final Rule merely imposes on States a requirement to ensure that health-care providers attest that they are not participating in hold-harmless arrangements, as defined under the preexisting statutory and regulatory provisions. Under the APA, CMS need only reasonably explain why the new attestation requirement was appropriate to assist its enforcement of the existing statutory prohibition. The preamble to the 2024 Final Rule adequately contains such explanation, 89 Fed. Reg. at 41,076-82, and Texas does not argue to the contrary.

Accordingly, given the nature of the 2024 Final Rule, CMS's consistency on the substantive question of what constitutes a hold-harmless arrangement is irrelevant. If the Court agrees that the statutory text encompasses private-redistribution schemes, *see supra* Part I.A, it follows that CMS's explanation of the need for the attestation requirement satisfies the APA's requirements.

**2.** Even if the agency's consistency were relevant to demonstrating the adequacy of the 2024 Final Rule, the history of official agency pronouncements in this

35

area demonstrates that CMS has been consistent on the question of whether private-redistribution schemes violate Subsection (4)(C)(i).

a.      Since 1992, CMS has interpreted Subsection (4)(C)(i) to mean that States "may not make Medicaid or other payments to providers that result in taxpayers being repaid dollar for dollar for their tax costs," because "use of any State payment … in a way that is guaranteed to repay the taxpayer for all or part of the cost of health care-related taxes, is a hold harmless situation" covered by Section 1396b(w)(4).  57 Fed. Reg. at 55,129.  That is the legal principle embodied in Subsection (4)(C)(i), CMS's 2008 Final Rule, and the 2019 Proposed Rule, and it bars the private-redistribution arrangements described in the 2023 Bulletin and the preamble to the 2024 Final Rule.

In the 2008 Final Rule, in particular, CMS explained that Subsection (4)(C)(i) applies whenever "a State payment is made available to a taxpayer … with the *reasonable expectation* that the payment would result in the taxpayer being held harmless for any part of the tax (through direct or indirect payments)."  73 Fed. Reg. at 9694 (emphasis added).  CMS issued this clarification for States in order to supersede the HHS Departmental Appeals Board (DAB) decision in *In re Hawaii Department of Human Services Board*, DAB No. 1981, 2005 WL 1540188 (2005), which had held that Subsection (4)(C)(i) did not extend to "grants and/or tax credits … designed by the States to compensate private pay residents of nursing homes for the costs of [a] tax passed on to them by their nursing homes."  73 Fed. Reg. at 9686.  When CMS explained that Subsection (4)(C)(i) reached those state grants to nursing-home patients that would

allow the patients to cover the costs of the nursing-home tax, it emphasized that a "direct guarantee does not need to be an explicit promise or assurance of payment," because "the element necessary to constitute a direct guarantee is the provision for payment" by the State. *Id.* at 9694.

CMS reiterated the same understanding of Subsection (4)(C)(i) in a 2019 proposed regulation that the district court acknowledged to be consistent with the 2023 Bulletin and 2024 Final Rule. *See* ROA.1981 ("The 2023 Bulletin formally adopted the agency's position from the 2019 withdrawn amendment."). By 2019, CMS had encountered privately arranged tax reimbursements, and after thorough consideration, it determined that the statute prohibited federal matching under such arrangements. CMS reiterated that Subsection (4)(C)(i) "prohibits hold harmless arrangements in which collected taxes are returned directly or indirectly to taxpayers," and that "a hold harmless situation" exists "whenever there exist[s] a 'reasonable expectation' that the taxpayer would be held harmless for the cost of the tax." 84 Fed. Reg. at 63,730-31 (citation omitted). It directly addressed the situation where "tax revenue" is used "to fund the non-federal share of Medicaid payments back to the taxpayers" through private agreements among the taxpaying providers "to redistribute … Medicaid payments to ensure that" the providers "receive all or any portion of their tax amount back." *Id.* at 63,734. CMS explained that because Subsection (4)(C)(i) prohibits matching for state revenue when "taxpayers have a reasonable expectation that their forthcoming Medicaid payment (including any redistribution), … results in participating

37

taxpayers being held harmless for all or a portion of the tax amount," such a scheme would be "inconsistent with existing statutory and regulatory requirements prohibiting hold harmless arrangements."  *Id.*  "The fact that a private entity makes the redistribution payment," CMS explained, "does not change the essential nature of the payment." *Id.* at 63,735.

Surveying this history, the Eleventh Circuit in *Florida* concluded that CMS "didn't change its position … regarding the meaning of [Subsection (4)](C)(i)."  161 F.4th at 786.  Rather, in the preamble to the 2008 Final Rule, "CMS advanced its reasonable-expectation interpretation of [Subsection (4)](C)(i)," and then "applied that interpretation in the [2023] Bulletin."  *Id.* at 787.  "And never … did CMS purport to exempt private-only arrangements from the hold-harmless rule." *Id.*

**b.**    In disagreeing with this conclusion, the district court took issue with CMS's explanation that "the 2008 Rule adopted CMS's current view of hold-harmless provisions," noting that the regulatory text has not changed.  ROA.1996.  But "the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules."  *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999). The preamble to the 2008 Final Rule shows unequivocally that CMS's understanding of Subsection (4)(C)(i) is consistent with its understanding now:  "[a] direct guarantee [under Subsection (4)(C)(i)] would be found when a State payment is made available to a taxpayer … in the reasonable expectation that the payment would result in the taxpayer being held harmless for any part of the tax." 73 Fed. Reg. at 9686;

38

*see* 89 Fed. Reg. at 41,081-82 ("[T]axpayers participating in these [private] redistribution arrangements have a reasonable expectation that they will be held harmless … ."). To be clear, the 2008 Final Rule did not expressly address privately arranged tax reimbursements, because CMS had not yet been repeatedly encountering such circumstances. But CMS had done so by 2019, and after thorough consideration, it determined that the statute prohibited federal matching under such arrangements under its reasonable-expectation interpretation explained in the preamble to the 2008 Final Rule. 84 Fed. Reg. at 63,734-35. That is the same position carried forward in the 2023 Bulletin and 2024 Final Rule.

The district court also singled out a sentence from the preamble to the 2008 Final Rule in asserting that the rule "expressly agreed with Texas's position here." ROA.1996; *see* 73 Fed. Reg. at 9690 ("This regulation is intended to carry out the purposes originally outlined in the [statute] … by prohibiting [federal financial participation] for health care-related taxes where the state has implemented a hold harmless provision."). But CMS did no such thing. The statement at issue was made in response to an unrelated comment, not in a discussion of private-redistribution schemes. *See* 73 Fed. Reg. at 9690 (responding to a comment regarding whether regulation required an objective or subjective analysis). And a State implements—*i.e.*, gives effect to—a hold-harmless provision by making the payment that ultimately holds taxpayers harmless, regardless of whether the State itself intends for the payment's redistribution. *See Implement*, Merriam-Webster.com, https://perma.cc/9DU2-KW3F (last updated Apr. 2, 2026)

39

(transitive verb, meaning "to give practical effect to and ensure of actual fulfillment by concrete measures").

**3.**    The district court nonetheless concluded that CMS had done an "about-face on whether private-provider agreements fit the definition of hold-harmless arrangement." ROA.1996. But CMS has never taken the official position that private-redistribution schemes were consistent with Subsection (4)(C)(i). None of the three pieces of "evidence" cited as demonstrating a change in position, ROA.1995, reflects an authoritative pronouncement of CMS's understanding of the statute. To constitute "the agency's 'authoritative' or 'official position'"—as opposed to "any more ad hoc statement not reflecting the agency's views"—an "interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context." *Kisor v. Wilkie*, 588 U.S. 558, 577 (2019). And as the Eleventh Circuit explained in rejecting this argument, the three items at issue are not "relevant source[s] for identifying CMS's official views." *Florida*, 161 F.4th at 787.

The first two statements are not attributable to CMS at all. First, the district court cited a 2005 decision by the HHS Departmental Appeals Board, which disagreed with CMS's conclusion that certain programs involving nursing facilities effectuated hold-harmless arrangements. ROA.940 (citing *Hawaii*, 2005 WL 1540188, at *23). But the HHS DAB is not the ultimate decisionmaker for CMS on the meaning of Subsection (4)(C)(i). The DAB is a separate entity within HHS, which provides independent review of disputed decisions from CMS and other HHS sub-agencies, in adversarial

proceedings in which CMS appears as a party. *See* U.S. HHS, *About DAB: Organizational Overview*, https://perma.cc/7FEF-EXWG; *Delta Found., Inc. v. United States*, 303 F.3d 551, 562 (5th Cir. 2002) (discussing adversarial nature of DAB proceedings). As the Eleventh Circuit thus explained, because "the Appeals Board operate[s] at some remove from the rest of HHS," it is not appropriate to "assume that [its] views are *CMS's* views." *Florida*, 161 F.4th at 787.

In any event, the *Hawaii* decision has no bearing on its own terms, as it did not involve a private-redistribution arrangement of the type at issue here. Rather than private providers redistributing Medicaid payments amongst themselves, a State was simultaneously imposing taxes on nursing facilities and issuing grants to the patients of such facilities to offset the effects of the tax. *See Hawaii*, 2005 WL 1540188, at *1. And in the cited section of the decision, the DAB concluded that CMS had acted inconsistent with its *own regulations*, not with the statute. *See id.* at *22-24. This single decision thus cannot demonstrate that CMS engaged in any "about-face on whether private-provider agreements," specifically, are covered by Subsection (4)(C)(i). ROA.1996.

Regardless, as noted above, CMS specifically clarified its interpretation of the statute in its 2008 Final Rule because the DAB in *Hawaii* had unduly constricted the application of Subsection (4)(C)(i). *See* 73 Fed. Reg. at 9685-86 (explaining that the DAB "found that these regulations did not clearly preclude certain types of arrangements that we believe to be within the scope of the statutory hold harmless

41

prohibition and implementing regulations"); *id.* at 9690 (explaining that, in the wake of the DAB decision, "it is necessary and appropriate for the Secretary to issue new regulations so that States will have clear guidance"). CMS has consistently explained that the 2008 Final Rule clarified the agency's interpretation of what constitutes a hold-harmless arrangement under Subsection (4)(C)(i) in response to the mistaken approach taken in *Hawaii*. *See* 84 Fed. Reg. at 63,730-31; 89 Fed. Reg. at 41,074.

Second, the district court cited an isolated snippet from a provider's appellate brief in an out-of-circuit Medicare case, which supposedly quotes testimony from an official in the HHS Office of the Inspector General (OIG). ROA.940. But neither the court nor Texas explained why the testimony is relevant to arrangements for *Medicaid* to reimburse providers for health-care-related taxes they paid. Moreover, like the DAB, OIG is an entity within HHS that operates independently from CMS. *See* OIG, HHS, *About OIG* (Jan. 2026), https://perma.cc/5RRX-FH9Q; *University of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 60-61 (3d Cir. 2003) ("The Office of Inspector General of HHS, along with inspector generalships for other federal administrative agencies and departments, … are designed to be independent and objective units separate from their respective departments and agencies." (footnote, citation, and quotation marks omitted)). The Eleventh Circuit thus also explained that it could not "assume that [OIG's] views" can be attributed to CMS. *Florida*, 161 F.4th at 787. Particularly where the alleged views were expressed by a single OIG official testifying in litigation about Medicare, they cannot stand in for CMS's official views about Medicaid.

42

Finally, Texas invokes a 2019 email in which the then-Director of CMS's Medicaid Financial Management Group was asked to confirm statements from a previous phone conversation with private parties. ROA.940; *see* ROA.253; ROA.262; ROA.1608. A CMS official's answer to a "confirming-our-conversation" email from a provider's counsel might be significant for that provider, but CMS does not advise States of its considered interpretation of the Medicaid statute through emails to individuals. And mistaking individualized communications for authoritative interpretations risks cutting short the agency's deliberative process. When novel facts arise outside the scope of CMS's existing interpretive decisions, CMS must look at the statute afresh to determine whether the plain text of the statute reaches the new financing arrangement. CMS is hesitant for good reason to take a formal position, with significant financial consequences for providers, until it has completed the thorough internal review that precedes the issuance of an interpretive document like the 2023 Bulletin or the 2024 Final Rule.

Accordingly, as the Eleventh Circuit explained, this "curt email referencing a phone call … is far too little to establish CMS's authoritative views." *Florida*, 161 F.4th at 787 (explaining that it would "marvel if a few casual communications in the guise of informal calls and a staff email constituted an agency's formal position" (quoting *UnitedHealthcare of N.Y., Inc. v. Lacewell*, 967 F.3d 82, 95-96 (2d Cir. 2020))). The Supreme Court has thus identified as "ad hoc statement[s] not reflecting the agency's views" things like an "'informal memorandum' recounting a telephone conversation between

43

employees" or a "'speech of a mid-level official.'" *Kisor*, 588 U.S. at 577; *see Food & Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 569 n.5 (2025) (noting that Supreme Court has "traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting" than a "nonbinding guidance document"); *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742-43 (1996) (expressing doubt that "informal" letter could demonstrate "a change of official agency position"). The APA does not require agencies to identify and address every preceding informal stray remark on a matter before adopting an official agency position.

In any event, assertions that CMS failed to account for a change are especially misplaced here. Central to the change-in-position doctrine is that an agency must be "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Wages*, 604 U.S. at 570 (quotation marks omitted). In the 2024 rulemaking, CMS expressly considered the difficulties faced by States who had come to rely on funds raised via private-redistribution arrangements. *See* 89 Fed. Reg. at 41,078 ("We recognize that any changes to States' financing can be challenging, given limited budgets."). CMS explained that for any State "find[ing] that it needs to transition to another financing source," CMS would "wor[k] with that State to ensure such a transition can be executed as seamlessly as possible under Federal law." *Id.* And CMS noted that it was delaying the effective date of the new requirements to January 2028, "[t]o help ease the transition to the collection of required provider attestations," "provide time for States to restructure [state-directed payments] that may involve

44

arrangements that prevent providers from truthfully attesting that they do not engage in hold harmless arrangements," and time for CMS to "work with States to come into compliance." *Id.* at 41,079.[4]

CMS also explained why it was moving forward with the 2024 Final Rule, notwithstanding the burden that some States would face: private-redistribution schemes were already prohibited under "existing Federal requirements for financing the non-Federal share of program expenditures." 89 Fed. Reg. at 41,078. And given that CMS has a "duty to ensure that Federal financial participation is paid only in accordance with Federal law," and was "increasingly encountering issues with States financing the non-Federal share … using potentially impermissible hold harmless arrangements," the "additional … resources required to implement" the new attestation requirement to assist its enforcement efforts were "warrant[ed]." *Id.* at 41,079.

Accordingly, even if CMS were changing an official position without acknowledgement, it nonetheless provided "good reasons" for its position and took into account any "serious reliance interests." *Wages*, 604 U.S. at 570 (quotation marks omitted). Under the circumstances, any failure to expressly acknowledge and explain

---

[4] The 2024 Bulletin likewise recognizes the difficulty that States who have come to rely on impermissible private-redistribution schemes may face, and the time required for States to come into compliance. ROA.669. The Bulletin thus provides that CMS would exercise "enforcement discretion" until January 2028, and use the time until then "to assist states, where necessary, to identify and transition to allowable sources of non-Federal share while mitigating any program disruption to the greatest extent possible." ROA.669-670.

the change "had no bearing on the procedure used or the substance of the decision reached." *Id.* at 590 (alteration and quotation marks omitted). Accordingly, this arbitrary-and-capricious challenge does not provide an independent basis for ruling in favor of Texas on the merits.

## II.  At a Minimum, the District Court Erred in Granting Universal Vacatur.

Even assuming that some relief were appropriate here, the district court erred in ordering universal vacatur of each of the challenged regulatory provisions and informational bulletins. ROA.1998-1999. The court understood vacatur to be "[t]he default rule" in this Circuit for APA cases, ROA.1998, and granted that extraordinary relief based on its conclusion that there was "no reason to depart from the ordinary course here," ROA.1999. That is incorrect.

The APA does not authorize vacatur.[5] In any event, even if vacatur were an available remedy under the APA, this Court's decisions make clear that a court is not required to vacate an agency action on a universal basis. *See Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding, without contradiction from any other member of the Court, that the district court could consider on remand

---

[5] The government acknowledges that this Court's precedents identify vacatur as an available remedy under the APA, *e.g.*, *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859-60 (5th Cir. 2022), but preserves its argument to the contrary. *See* Brief for the United States at 40-44, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58), 2022 WL 4278395, at *40-44; Reply Brief for the United States at 16-20, *Texas*, 599 U.S. 670 (No. 22-58), 2022 WL 17170668, at *16-20.

"a more limited remedy" than universal vacatur of the rule, and instructing the district court to "determine what remedy—injunctive, declarative, or otherwise—is appropriate to effectuate" the judgment), *aff'd*, 602 U.S. 406 (2024). Rather, the Court has acknowledged that party-specific vacatur in lieu of universal vacatur can be appropriate in certain circumstances. *See Texas Med. Ass'n v. U.S. HHS*, 120 F.4th 494, 510 (5th Cir. 2024) ("party-specific vacatur is definitely appropriate in other situations"), *reh'g en banc granted, panel opinion vacated per curiam*, 138 F.4th 961 (5th Cir. 2025).

If the Court concludes that Texas prevails on the merits, it should nonetheless vacate and remand for the entry of party-specific relief. Relief limited to the sole plaintiff is particularly appropriate here for two reasons.

First, the Eleventh Circuit has already ruled for CMS on the statutory-authority and arbitrary-and-capricious challenges at issue. Party-specific vacatur is thus appropriate as a matter of comity, to avoid depriving another circuit's ruling of its proper effect within the scope of its jurisdiction. Such considerations are an appropriate basis for limiting the scope of relief. For instance, in *Cargill*, three other circuits had already declined to grant injunctions against the challenged agency action. *See* 57 F.4th at 457-58. Although the en banc Court ruled for the plaintiff, the plurality observed that "a more limited remedy" than universal vacatur might be "appropriate in these circumstances." *Id.* at 472. A more limited remedy is indeed appropriate here based on the conflicting decision of another circuit.

47

Second, the operation of the Medicaid program differs from State to State, with each State having its own unique plan and specialized state-specific federal share percentage. Insofar as CMS's interpretation and regulation govern the administration of the Medicaid program within each individual State, it would be straightforward to apply the judgment here solely as to Texas, as to which CMS would be permanently enjoined from enforcing its interpretation of Subsection (4)(C)(i) anyway if Texas prevails on the merits.[6] This case is thus unlike those in which the Court has rejected narrower vacatur because of concerns about "uniformity and predictability" for regulated parties nationwide. *Texas Med. Ass'n v. U.S. HHS*, 110 F.4th 762, 780 (5th Cir. 2024) (involving arbitration of certain disputes between insurers and health-care providers).

---

[6] In converting the preliminary injunction in this case into a permanent injunction, the parties understand the district court to have entered party-specific injunctive relief applying only to Texas. *See* ROA.574-575; ROA.1986. A universal injunction would have been plainly inconsistent with the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025).

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

At a minimum, this Court should narrow the scope of relief to Texas.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

JAY R. COMBS
*United States Attorney*

BRAD HINSHELWOOD

*/s/ McKaye L. Neumeister*
McKAYE L. NEUMEISTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7231*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8100*
*McKaye.L.Neumeister@usdoj.gov*

April 2026

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,033 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 1396b(w) (excerpt)....................................................................................A1

42 C.F.R. § 433.68 (excerpt) ......................................................................................A2

42 C.F.R. § 438.6 (excerpt).........................................................................................A3

**42 U.S.C. § 1396b (excerpt)**

**§ 1396b. Payment to States.**

\* \* \*

**(w) Prohibition on use of voluntary contributions, and limitation on use of provider-specific taxes to obtain Federal financial participation under Medicaid**

**(1)(A)** Notwithstanding the previous provisions of this section, for purposes of determining the amount to be paid to a State (as defined in paragraph (7)(D)) under subsection (a)(1) for quarters in any fiscal year, the total amount expended during such fiscal year as medical assistance under the State plan (as determined without regard to this subsection) shall be reduced by the sum of any revenues received by the State (or by a unit of local government in the State) during the fiscal year--

    **(i)** from provider-related donations (as defined in paragraph (2)(A)), other than--

      **(I)** bona fide provider-related donations (as defined in paragraph (2)(B)), and

      **(II)** donations described in paragraph (2)(C);

    **(ii)** from health care related taxes (as defined in paragraph (3)(A)), other than broad-based health care related taxes (as defined in paragraph (3)(B));

    **(iii)** from a broad-based health care related tax, if there is in effect a hold harmless provision (described in paragraph (4)) with respect to the tax; or

    \* \* \*

**(4)** For purposes of paragraph (1)(A)(iii), there is in effect a hold harmless provision with respect to a broad-based health care related tax imposed with respect to a class of items or services if the Secretary determines that any of the following applies:

    **(A)** The State or other unit of government imposing the tax provides (directly or indirectly) for a payment (other than under this subchapter) to taxpayers and the amount of such payment is positively correlated either to the amount of such tax or to the difference between the amount of the tax and the amount of payment under the State plan.

    **(B)** All or any portion of the payment made under this subchapter to the taxpayer varies based only upon the amount of the total tax paid.

A1

**(C)(i)** The State or other unit of government imposing the tax provides (directly or indirectly) for any payment, offset, or waiver that guarantees to hold taxpayers harmless for any portion of the costs of the tax.

**(ii)** For purposes of clause (i), a determination of the existence of an indirect guarantee shall be made under paragraph (3)(i) of section 433.68(f) of title 42, Code of Federal Regulations, as in effect on November 1, 2006, except that for portions of fiscal years beginning on or after January 1, 2008, and before October 1, 2011, "5.5 percent" shall be substituted for "6 percent" each place it appears, and for fiscal years beginning on or after October 1, 2026, the applicable percent determined under subparagraph (D) shall be substituted for "6 percent" each place it appears.

\* \* \* \*

## 42 C.F.R. § 433.68 (excerpt)

### § 433.68. Permissible health care-related taxes.

\* \* \*

(f) Hold harmless. A taxpayer will be considered to be held harmless under a tax program if any of the following conditions applies:

(1) The State (or other unit of government) imposing the tax provides for a direct or indirect non–Medicaid payment to those providers or others paying the tax and the payment amount is positively correlated to either the tax amount or to the difference between the Medicaid payment and the tax amount. A positive correlation includes any positive relationship between these variables, even if not consistent over time.

(2) All or any portion of the Medicaid payment to the taxpayer varies based only on the tax amount, including where Medicaid payment is conditional on receipt of the tax amount.

(3) The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.

(i)(A) An indirect guarantee will be determined to exist under a two prong "guarantee" test. If the health care-related tax or taxes on each health care class are applied at a rate that produces revenues less than or equal to 6 percent of the revenues received by the taxpayer, the tax or taxes are permissible under this test. The phrase "revenues received by the taxpayer" refers to the net

patient revenue attributable to the assessed permissible class of health care items or services. However, for the period of January 1, 2008 through September 30, 2011, the applicable percentage of net patient service revenue is 5.5 percent. Compliance in State fiscal year 2008 will be evaluated from January 1, 2008 through the last day of State fiscal year 2008. Beginning with State fiscal year 2009 the 5.5 percent tax collection will be measured on an annual State fiscal year basis.

(B) When the tax or taxes produce revenues in excess of the applicable percentage of the revenue received by the taxpayer, CMS will consider an indirect hold harmless provision to exist if 75 percent or more of the taxpayers in the class receive 75 percent or more of their total tax costs back in enhanced Medicaid payments or other State payments. The second prong of the indirect hold harmless test is applied in the aggregate to all health care taxes applied to each class. If this standard is violated, the amount of tax revenue to be offset from medical assistance expenditures is the total amount of the taxpayers' revenues received by the State.

(ii) [Reserved]

## 42 C.F.R. § 438.6 (excerpt)

## § 438.6. Special contract provisions related to payment.

* * *

(c) State directed payments under MCO, PIHP, or PAHP contracts—

   * * *

(2) Standards for State directed payments.

(i) State directed payments specified in paragraphs (c)(1)(i) and (ii) and (c)(1)(iii)(C) through (E) of this section must have written prior approval that the standards and requirements in this section are met.

(ii) Each State directed payment must meet the following standards. Specifically, each State directed payment must:

   * * *

(G) Comply with all Federal legal requirements for the financing of the non–Federal share, including but not limited to, 42 CFR 433, subpart B;

(H)(1) Ensure that providers receiving payment under a State directed payment attest that they do not participate in any hold harmless arrangement

A3

for any health care-related tax as specified in § 433.68(f)(3) of this subchapter in which the State or other unit of government imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of the payment, offset, or waiver directly or indirectly guarantees to hold the taxpayer harmless for all or any portion of the tax amount, and

(2) Ensure either that, upon CMS request, such attestations are available, or that the State provides an explanation that is satisfactory to CMS about why specific providers are unable or unwilling to make such attestations;

\* \* \* \*